16 MAG 4997

Approved: _____
ROBERT ALLEN
Assistant United States Attorney

Before: HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**
                                  :
           - v. -                 :    Violations of 15 U.S.C. §§
                                  :    78j(b) & 78ff; 17 C.F.R.
NICHOLAS MITSAKOS,                :    § 240.10b-5; 18 U.S.C. §§
                                  :    371, 1343, and 2.
           Defendant.             :
                                  :    COUNTY OF OFFENSES:
- - - - - - - - - - - - - - - - - x    New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

KURT HAFER, being duly sworn, deposes and says that he is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

1. From at least in or about May 2014 through in or about August 2016, in the Southern District of New York and elsewhere, NICHOLAS MITSAKOS, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and object of the conspiracy that NICHOLAS MITSAKOS, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal

1

Regulations, Section 240.10b-5, by: (1) employing devices, schemes and artifices to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

    3. It was a further part and object of the conspiracy that NICHOLAS MITSAKOS, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

    4. In furtherance of the conspiracy and to effect its illegal objects, NICHOLAS MITSAKOS, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. In or about May 2014, MITSAKOS and a co-conspirator not named in this Complaint ("CC-1") retroactively modified a hypothetical Bloomberg portfolio to enhance the supposed returns of that portfolio, and then caused those returns to be disseminated to potential investors as indicative of actual trading performance.

    b. In or about September 2015, MITSAKOS accepted an investment of approximately $1,993,500 from a Cayman Islands-based fund ("Victim-1"), which MITSAKOS used, in part, to pay personal expenses such as credit card debt and rent.

    (Title 18, United States Code, Section 371.)

### COUNT TWO
### (Securities Fraud)

    5. From at least in or about May 2014 through in or about August 2016, in the Southern District of New York and elsewhere,

NICHOLAS MITSAKOS, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, MITSAKOS made, and caused to be made, false representations to investors regarding the returns and assets under management of Matrix Capital Management LLC ("Matrix"), a hedge fund purportedly operated by MITSAKOS.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

### COUNT THREE
### (Wire Fraud)

6.     From at least in or about May 2014 through in or about August 2016, in the Southern District of New York and elsewhere, NICHOLAS MITSAKOS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MITSAKOS made, and caused to be made, false representations, through means including emails, to investors regarding the returns and assets under management of Matrix, and misappropriated investor funds for his own use.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7.     I am currently employed as a Criminal Investigator in the Securities and Commodities Fraud unit at the United States

Attorney's Office for the Southern District of New York, and I have been employed in this position since approximately February 2016. Prior to that date, I was employed as a Criminal Investigator at the United States Department of Energy's Office of Inspector General for approximately six and a half years. During my tenure with both offices, I have participated in numerous investigations of financial crimes and complex frauds.

8. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the U.S. Securities and Exchange Commission ("SEC"), documents provided by financial institutions and solicited investors, and documents produced in response to judicially authorized search warrants. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, moreover, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## BACKGROUND

9. Matrix is a purported hedge fund operated in part by NICHOLAS MITSAKOS, the defendant, and CC-1. MITSAKOS was the Chairman and CEO of Matrix. CC-1 was an Associate at Matrix. Matrix was incorporated in the State of Delaware under the name "Matrix Capital, LLC" on or about October 4, 2013, and in the State of California under the name "Matrix Capital Markets, LLC" on or about October 7, 2013.

## MISREPRESENTATIONS REGARDING MATRIX

10. For the reasons described below, there is probable cause to believe that NICHOLAS MITSAKOS, the defendant, made misrepresentations regarding Matrix's past performance and assets under management in order to solicit investments. Although MITSAKOS represented to potential investors that Matrix managed millions of dollars of investor funds and had achieved outsized returns, Matrix's supposed returns were in fact retroactively manipulated, not based on real trading, and were, therefore, false.

11. Based on my conversations with representatives of Victim-1 and a New York-based fund ("Victim-2") solicited by

NICHOLAS MITSAKOS, the defendant, as well as my review of emails sent and received by MITSAKOS and CC-1, I have learned the following, in substance and in part:

        a.    MITSAKOS sent marketing materials to potential investors describing, among other things, Matrix's assets under management and past performance. In or about January 2015, for example, MITSAKOS sent a newsletter to multiple individuals, including representatives of Victim-1, stating that Matrix had achieved annual returns of 25.4% in 2012, 66.3% in 2013, and 19.4% in 2014. In the email transmitting this newsletter, MITSAKOS represented that Matrix's "three-year performance, net of fees, has exceeded all major indices." Similarly, on or about February 28, 2016, MITSAKOS sent a completed due diligence questionnaire to Victim-2 stating that Matrix's annual returns were 25.4% in 2012, 66.3% in 2013, 20.9% in 2014, and 49.5% between January and October of 2015.

        b.    MITSAKOS represented in communications to potential investors that Matrix had significant assets under management. For example:

            i.    On or about May 13, 2015, MITSAKOS sent an email to a representative of a New York-based financial institution ("Bank-1") in which MITSAKOS stated, in substance and in part, that Matrix had "[o]ver $100,000,000" in both total net liquid assets and total net worth.

            ii.    Similarly, on or about August 26, 2015, a representative from Victim-1 asked MITSAKOS whether information he had provided on behalf of Matrix was "simulated data from [Bloomberg]," to which MITSAKOS replied, in substance and in part, that while he had in fact "modeled the portfolio in Bloomberg, on a pro rata basis," the performance information he had provided "represents actual trades, positions and allocations." [1]

            iii.    Based on my conversations with representatives of Victim-2, moreover, I have learned that MITSAKOS approached Victim-2 in an effort to raise capital on behalf of Matrix (although Victim-2 has not in fact made an investment with Matrix or MITSAKOS). On or about June 21, 2016, a representative of Victim-2, acting at the direction of law

---

[1] Bloomberg is a financial software, services, and media company that offers customers, among other things, tools to track the performance of particular portfolios of stocks, which the customer is not required to own.

5

enforcement, placed a recorded call to MITSAKOS. During the call, MITSAKOS stated, in substance and in part, that Matrix had "a little more than 60 million, about 60 million give or take, of assets under management" as of the date of the call.

12.   Based on my conversations with a particular representative of Victim-1 ("Manager-1"), I have learned that Victim-1 made an investment of approximately $1,993,500 with NICHOLAS MITSAKOS, the defendant, in or about September 2015. Manager-1 recommended the above-referenced investment based in part on purported annual returns provided by MITSAKOS, which Manager-1 understood to represent actual trading activity.

13.   There is probable cause to believe that the representations made by NICHOLAS MITSAKOS, the defendant, described above in paragraphs 11 and 12, are misleading. I believe this for the following reasons, among others:

   a.   I believe that Matrix never had any material amount of assets under management. First, I have reviewed multiple emails in which MITSAKOS and CC-1 discuss creating and maintaining a hypothetical Bloomberg portfolio to keep track of the returns Matrix would be generating were it to be capitalized. As discussed below, Matrix does not appear to have traded actual securities until in or about September 2015.[2] Second, based on my conversations with Manager-1, I have learned that Manager-1 attempted to raise capital on behalf of Matrix. In so doing, Manager-1 sought to verify Matrix's annual returns, including by requesting trading records from Bloomberg. MITSAKOS informed Manager-1, however, that the data had become corrupted and so could not be provided. Third, Manager-1 spoke with an attorney representing MITSAKOS ("Attorney-1") in or about January 2016. During that conversation, Attorney-1 told Manager-1, in substance and in part, that MITSAKOS did not operate a hedge fund. MITSAKOS subsequently denied this claim when contacted by Manager-1.

   b.   Notwithstanding that the supposed earnings Matrix repeated to potential investors were largely based on models instead of actual trading, I believe that MITSAKOS also manipulated Matrix's hypothetical earnings after the fact to make Matrix's supposed returns more attractive. For example:

---

[2] The returns do, however, appear to relate in part to the 2012 performance of a personal brokerage account maintained by CC-1. This account had between approximately $3,000 and $6,000 in value at the time.

6

        i.     On or about May 13, 2014, MITSAKOS sent CC-1 an email stating, "Let's talk about our monthly performance in 2014. Obviously, we didn't really actively manage it, but there are some big monthly losses that I don't think we would've had if we were managing the portfolio. I know this is a bit of revisionist history...." Later that day, CC-1 responded, "I agree," and suggested "trim[ming]" two positions that had performed poorly in order to "see what that does to the performance [of the fund]." CC-1 later sent an email to MITSAKOS stating, "I will re-run the monthly performance numbers when [another individual] is not hovering around the bloomberg." On or about May 14, 2014, CC-1 sent MITSAKOS an email with "revised monthly returns." These "revised" returns were subsequently disseminated to potential investors by MITSAKOS and CC-1 as returns based on actual trading.

        ii.     On or about June 30, 2014, CC-1 sent MITSAKOS an email with the subject, "Matrix GM current portfolio holdings." In the email, CC-1 asked MITSAKOS "[w]hat to do" with a particular investment that "could remain illiquid for the next 2-6 months." MITSAKOS responded the same day, stating, "I think we should assume that we would've sold [the investment] June 1" — around a month earlier. MITSAKOS further cautioned, "Our model portfolio, from now on, should focus on deep value, liquid positions."

        iii.     On or about July 4, 2014, CC-1 sent MITSAKOS an email with annual returns for the hypothetical portfolio for 2012, 2013, and 2014 (year to date). These returns were, respectively, 24.4%, 63.5%, and 4.83%. Several changes were subsequently made to improve these returns. First, on or about July 15, 2014, CC-1 sent MITSAKOS an email stating, in substance and in part, that he had retroactively added "a 5% position in Western Digital" to the portfolio, which change had the effect of improving Matrix's supposed performance. Second, on or about July 16, 2014, MITSAKOS sent an email to CC-1 stating, "I think the cash balance we assume for 2014 is too high," and asking CC-1 to "reduce the cash we held to 10% of the portfolio, and then allocate pro rata that additional cash to all the other investments." MITSAKOS continued, "Let's see how that impacts our performance for 2014." CC-1 responded, "Ok. I'll reallocate the cash to our holdings on January 1, 2014 and re-run the numbers." On July 17, 2014, CC-1 emailed MITSAKOS a revised investor newsletter listing returns for 2012, 2013, and 2014 (year to date) as 24.4%, 69.2%, and 7.0%, respectively — reflecting increases of 5.7% in 2013 and 2.17% in 2014 from earlier calculated returns.

iv. On or about January 9, 2015, CC-1 emailed MITSAKOS a draft investor newsletter listing Matrix's November 2014 performance as -1.8%, its December 2014 performance as -1.7%, and its total 2014 performance as 0.4%. MITSAKOS, however, sent a newsletter listing the fund's total 2014 performance as 19.4% to multiple individuals, including representatives of Bank-1. I believe that MITSAKOS simply changed his portfolio's purported 2014 performance from 0.4% to 19.4%. I believe this, in part, because, on or about January 15, 2015, MITSAKOS sent the draft investor newsletter listing a 0.4% 2014 return to another individual — and then, on or about the following day, sent the same person the version of the investor newsletter listing a 19.4% 2014 return with the message, "The last one had a typo and some formatting issues."

v. Subsequent representations by Matrix to investors have included even higher annual returns than those listed above. For example, on or about July 22, 2015, MITSAKOS sent an email to a representative of Victim-1 with an investor newsletter listing 2012, 2013, and 2014 returns as 25.4%, 66.3%, and 20.9%, respectively.

c. As discussed above in paragraph 11(a), MITSAKOS stated in emails disseminating investor newsletters that reported returns for Matrix were "net of fees"—that is, adjusted downward to reflect fees charged by Matrix to investors. In a July 15, 2014 email from MITSAKOS to CC-1, however, MITSAKOS specifically instructed CC-1 that he did not "see a need to put 'gross of fees'" in Matrix marketing materials, which I believe suggests that Matrix's purported returns had not actually been adjusted for the performance fees Matrix would have charged (and hence were not "net of fees").

14. Based on my review of emails, as well as my conversations with Manager-1 and a representative of Victim-2, I have learned that NICHOLAS MITSAKOS, the defendant, did not tell investors that Matrix's returns were based on hypothetical trading, and did not tell investors that the hypothetical trading on which Matrix's returns had been based were retroactively altered to improve supposed results.

MISAPPROPRIATION OF INVESTOR FUNDS

15. For the reasons described below, I believe that NICHOLAS MITSAKOS, the defendant, misappropriated approximately $793,500 of funds from Victim-1 for his personal use.

16. Based on my conversations with Manager-1, I have learned the following, in substance and in part:

a. As described above, Manager-1 caused Victim-1 to make an investment of approximately $1,993,500 with NICHOLAS MITSAKOS, the defendant, in or about September 2015. This investment was intended to be used to capitalize a separate fund (the "Joint Fund") that MITSAKOS would have managed. Victim-1's investment was made pursuant to, and governed by, a "Portfolio Management Agreement" and a "Relationship Agreement." These agreements were executed by MITSAKOS and Victim-1 in or about March 2015.

b. Manager-1 intended Manager-1's investment to be wired to an account at Bank-1 in the name of the Joint Fund (the "Joint Fund Account"). Although MITSAKOS would have functioned as an investment manager for the Joint Fund, authorization from representatives of Victim-1 would have been required for any disbursements of investor proceeds from the Joint Fund Account. Contrary to Manager-1's understanding, however, MITSAKOS caused Manager-1's investment to be wired to a different account at Bank-1 associated with Matrix ("Matrix Account-1"), over which MITSAKOS had authority to make disbursements.

c. In or about December 2015, Manager-1 learned from representatives of Bank-1 that, of the approximately $1,993,500 that was wired to Matrix Account-1, MITSAKOS invested approximately $1,200,000 and used portions of the remaining $793,500 for personal and business expenses. Manager-1 met with MITSAKOS in or about the same month at a restaurant in New York, New York. During the meeting, MITSAKOS told Manager-1, in substance and in part, that he had taken the funds as prepaid management expenses.[3] MITSAKOS also stated, in substance and in part, that he would repay Manager-1 by transferring his own shares of Matrix to an account associated with the Joint Fund. MITSAKOS, however, never transferred any shares in this manner (and, as already discussed, there is probable cause to believe that Matrix did not have any assets under management at the time other than Victim-1's own investment, meaning that its shares would have had little or no value).

---

[3] Based on my review of emails, I have also learned that, on or about January 15, 2016, NICHOLAS MITSAKOS, the defendant, sent an email to a representative of Victim-1, in which MITSAKOS stated, in substance and in part, that he "had bills due immediately, and many bills that were overdue," and that he "simply made the choice to assume that the remaining $800,000 was prepaid management fees."

9


    d. Based on Manager-1's understanding of the relevant contracts with MITSAKOS, MITSAKOS was not authorized to use Victim-1's investment for personal or business expenses.

    e. The approximately $1,200,000 that MITSAKOS did use to invest was wired to an account with a New York-based financial institution, where it was used to trade stocks. At the time this account was closed, and after accounting for withdrawals, fees, and trading losses, only approximately $350,000 of the original $1,200,000 remained.

  17. I have reviewed a Portfolio Management Agreement and Relationship Agreement provided to me by Manager-1. Both of the agreements were executed by Victim-1 and NICHOLAS MITSAKOS, the defendant, in or about March 2015. Based on my review of these agreements, I do not believe that there is any contractual basis for MITSAKOS to have considered parts of Victim-1's investment to be prepaid management fees.

  18. Based on my conversations with representatives of the SEC as well as my own review of records from Bank-1 and other financial institutions used by NICHOLAS MITSAKOS, the defendant, I have learned the following, in substance and in part:

    a. On or about September 18, 2015, Matrix Account-1 received a wire transfer of approximately $1,993,500 from an account used by Victim-1. On or about October 13, 2015, approximately $1,200,000 of this amount was wired from Matrix Account-1 to an account at a New York-based financial institution, where it was used to trade stocks.

    b. Between in or about September 2015 and in or about January 2016, the following disbursements, among others, were made using the remaining $793,500 received from Victim-1: approximately $32,483 was wired to Bloomberg Financial LP; approximately $133,650 was used to pay various financial services companies; approximately $104,326 was used to pay credit cards; approximately $25,521 was wired to Lawyer-1's law firm; and approximately $256,311 was wired to another account associated with Matrix ("Matrix Account-2").

    c. Between in or about September 2015 and in or about January 2016, MITSAKOS made the following disbursements, among others, from Matrix Account-2: approximately $11,000 was used to make car payments; approximately $103,000 was used to make credit card payments; and approximately $72,000 was used to pay an individual who I believe, based on my review of emails

10

between MITSAKOS and the recipient of the disbursements, to be the landlord of MITSAKOS's residence.

WHEREFORE, the deponent prays that an arrest warrant be issued for NICHOLAS MITSAKOS, the defendant, and that he be imprisoned or bailed as the case may be.

_____
KURT HAFER
CRIMINAL INVESTIGATOR
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK

Sworn to before me this
5th day of August, 2016

_____
THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11